**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRAVELERS UNITED, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 23-3584 (BAH) |
| | Judge Beryl A. Howell |
| HILTON WORLDWIDE HOLDINGS INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

Plaintiff Travelers United, Inc., a "nonprofit public interest organization" whose mission "is to improve and enhance travel for consumers," initiated this putative class action in D.C. Superior Court, alleging violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28–3901 *et seq.*  Compl. ¶¶ 12–13, 110–21, ECF No. 1-2.  In a one-count complaint brought "on behalf of the interests of . . . a class of consumers," *id.* ¶¶ 92, 112 (citation omitted), plaintiff claims that defendants Hilton Worldwide Holdings Inc. and Hilton Domestic Operating Company Inc. (collectively, "defendants" or "Hilton"), have "been systemically cheating consumers out of tens of millions of dollars each year" through their "deceptive Junk Fee practices" that "trick consumers into paying more" to book a hotel room "than they otherwise would," *id.* ¶¶ 1, 16–17, 21, 119; *see* D.C. Code § 28–3905(k)(1)(D)(i).[1]  Shortly after the filing of plaintiff's complaint in Superior Court, defendants timely removed the case to this Court, asserting subject matter jurisdiction, pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453.  Plaintiff now moves to remand for lack of Article III

---

[1]       Plaintiff also named as defendants unknown Does 1–20, "who work in conjunction with Hilton to engage in the unlawful conduct described."  Compl. ¶ 19.

standing, Pl.'s Mot. to Remand, ECF No. 11; Pl.'s Mem. Supp. Mot. to Remand ("Pl.'s Mot.") at 6, ECF No. 11-1, disputing defendants' allegations that plaintiff has associational and organizational standing sufficient to support the exercise of federal jurisdiction, *see* Defs.' Not. Removal ¶¶ 4, 22, ECF No. 1.

This CAFA-generated remand litigation presents a "through-the-looking-glass-situation," where defendants, as "the party invoking the court's jurisdiction," seek to "establish the predicates" for plaintiff's Article III standing, in the face of plaintiff's vigorous denial of the same. *Abigail All. for Better Access to Developmental Drugs ("Abigail All.") v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (citation omitted); *see also* Mot. Hr'g Tr. at 18:6–9, ECF No. 22 (plaintiff's counsel describing "through-the-looking-glass-situation" in which "defendant is foisting organizational or associational standing on an organization that has not pled that and does not seek that"). Underlying this dispute is CAFA, a statute enacted to address what some in Congress perceived as tactics by members of the plaintiffs' bar to "'game' the procedural rules and keep nationwide or multi-state class actions in state courts[.]" *Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1752 (2019) (Alito, J. dissenting) (quoting S. Rep. No. 109–14, at 5 (2005)).

Notwithstanding the peculiar posture presented in this remand litigation, the issue to be resolved—whether plaintiff has Article III standing to bring its CPPA suit in federal court—is straightforward. For the reasons explained below, plaintiff lacks Article III standing. Plaintiff's motion to remand is accordingly granted.

## I.   BACKGROUND

The statutory, factual, and procedural background relevant to resolving plaintiff's instant motion to remand is summarized below.

A.     **District of Columbia Consumer Protection Procedures Act ("CPPA")**

CPPA prohibits "an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby," D.C. Code § 28-3904, and defines the conduct covered by this proscription to include a variety of unlawful practices as well the "violat[ion] [of] any provision" of certain enumerated statutes, *id.* § 28-3904(y)–(ll).  More specifically, as relevant here due to citation in plaintiff's complaint, CPPA's subsections (e), (f), and (f-1) prohibit making misrepresentations or omissions as to "a material fact" when those misrepresentations or omissions have "a tendency to mislead," *id.* § 28-3904(e), (f), (f-1); subsection (h) proscribes persons from "advertis[ing] or offer[ing] goods or services without the intent to sell them or without the intent to sell them as advertised or offered," *id.* § 28-3904(h); and subsection (j) prohibits "mak[ing] false or misleading representations of fact concerning . . . the price in comparison to price of competitors," *id.* § 28-3904(j).

As part of its enforcement regime, CPPA authorizes a "public interest organization" to bring a representative suit "on behalf of the interests of . . . a class of consumers" to "seek[] relief from the use by any person of" an unlawful trade practice, provided "the consumer or class could bring an action" under the statute, and the public interest organization has a "sufficient nexus to the interests involved of the . . . class to adequately represent those interests."  *Id.* § 28-3905(k)(1)(D)(i)–(ii).  In enacting this provision, the D.C. Council "convey[ed] a clear legislative intent to modify Article III's strictures . . . with a more expansive statutory test," such that "[i]f an entity . . . meets the CPPA statutory test governing public interest organization standing, it has standing to sue 'without regard to whether it also satisfies traditional Article III standing requirements.'"  *Ctr. for Inquiry Inc. v. Walmart, Inc.*, 283 A.3d 109, 116 n.4 (D.C. 2022) (first alteration in original) (quoting *Animal Legal Def. Fund v. Hormel Foods Corp.*, 258 A.3d 174, 179 (D.C. 2021)).

CPPA authorizes injured consumers to recover actual damages; the greater of treble damages or $1,500 per violation; attorney's fees; punitive damages; an "injunction against the use of the unlawful trade practice"; "additional relief as may be necessary to restore to the consumer money or property . . . which may have been acquired by means of the unlawful trade practice"; and/or "[a]ny other relief which the court determines proper." *Id.* § 28-3905(k)(2)(A)–(F).

### B.    Factual Background

Plaintiff describes itself as a "nonprofit public interest organization" that "has been instrumental in advocating against hidden hotel fees both federally and locally in the District," including through meetings with members of Congress, the D.C. Council, and others, to "educat[e], alert[], and advocat[e] against hidden hotel Junk Fees."  Compl. ¶¶ 12–14; *see also* Compl. ¶ 4 n.2 (defining "junk fees" as "'unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer' or fees that are 'hidden,' such as those 'disclosed only at a later stage in the consumer's purchasing process or not at all'" (quoting Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413, 67413 (Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464))).  Defendant Hilton Worldwide Holdings Inc. "owns, manages, and franchises a broad portfolio of hotels," including in Washington, D.C., while the second Hilton entity named in plaintiff's complaint, Hilton Domestic Operating Company Inc., "appears to be Hilton's primary operating entity in the United States." Compl. ¶¶ 16–17.

The complaint alleges that Hilton has engaged in "junk fee practices" that "deceiv[e] consumers and trick[] them out of their hard-earned money." *Id.* ¶¶ 7, 49 (capitalization omitted). As illustrative examples, plaintiff describes "four separate occasions in the booking process [when] Hilton advertises a room price that does not include Junk Fees that a consumer must ultimately pay to Hilton in order to book the room." *Id.* ¶ 76.  "[D]uring the booking process, Hilton continues

to advertise an incomplete and inaccurate room price that does not include Junk Fees, as it partitions Junk Fees from the room rate, and does not even conspicuously disclose the Junk Fee." *Id.* ¶ 77.  Further, "by calling the Junk Fee 'mandatory'" and "by telling consumers that it must assess the fee 'per room, per night,' just as it must assess mandatory taxes 'per room, per night,'" Hilton "creates the false and deceptive impression that the fee is an amount that Hilton is obligated to charge by law or for other reasons outside of its control, rather than a fee Hilton chooses to charge for its own solitary gain."  *Id.* ¶ 78.  By "misrepresent[ing] and conceal[ing] the actual cost of its rooms," *id.* ¶ 49, Hilton "induc[es] consumers to undertake the search and cognitive effort to pick a hotel room and to psychologically commit to a room based on an inaccurate room rate," *id.* ¶ 86, all "to increase its revenues without appearing to raise the room rate at its hotels," *id.* ¶ 51.

Based on these allegations about "Hilton deceiving customers about the rates of its hotel rooms," *id.* ¶ 48, plaintiff, on September 20, 2023, commenced this putative class action in D.C. Superior Court alleging, in a single count, that defendants' "deceptive Junk Fee practices" constitute "an unfair and deceptive trade practice" in violation of the CPPA, *id.* ¶¶ 74–75, 110–21. As a public interest organization suing "on behalf of the interests of . . . a class of consumers," to which the organization has a "sufficient nexus . . . to adequately represent those interests," D.C. Code § 28-3905(k)(1)(D), plaintiff seeks to certify two proposed classes, pursuant to D.C. Superior Court Rule of Procedure 23, *see* Compl. ¶¶ 15, 92, 95–97.  These two classes are (1) a "nationwide class" consisting of "[a]ll individuals in the United States who booked a room at a Hilton hotel within the District of Columbia for personal use and paid a resort, destination, and/or other similar fee to Hilton," *id.* ¶ 96; and (2) a "District of Columbia" class consisting of "[a]ll residents of the District of Columbia" who did the same, *id.* ¶ 97.  Plaintiff alleges that "Hilton's deceptive Junk

Fee practices violated each class member's individual statutory right to truthful information from Hilton about the actual nightly rate and true nature of the Junk Fees for hotels rooms," and that "[c]lass members suffered actual injuries as a result of Hilton's unfair and deceptive practices[.]" *Id.* ¶¶ 119–20.

Plaintiff seeks all forms of relief available under the CPPA: actual and punitive damages; the greater of treble damages of the actual damages or statutory damages of $1,500 per violation, with "[e]ach night that Hilton charged Junk Fees constitut[ing] a violation"; injunctive relief; attorneys' fees and costs; "any additional relief as may be necessary to restore to the Class members money which may have been acquired by means of Hilton's unlawful trade practices"; and any "other and further relief as the Court finds necessary and proper." *Id.* ¶¶ 121, 123; *see* D.C. Code ¶ 28-3905(k)(2).

On December 1, 2023, defendants timely removed the suit to this Court, and on December 29, 2023, plaintiff timely moved to remand. *See* Defs.' Not. Removal; Pl.'s Mot. Following a hearing on plaintiff's motion, on May 8, 2024, *see* Mot. Hr'g Tr.; *see* Min. Entry (May 8, 2024), the pending remand motion is now ripe for resolution.

## II.     LEGAL STANDARD

### A.     Article III Standing

The authority of federal courts "under the Constitution is limited to resolving 'Cases' or 'Controversies[,]' Art. III, § 2." *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023); *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))).  A plaintiff's standing to pursue a claim is "an essential and unchanging" element of the bedrock cases-or-controversy requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  As a result, if a plaintiff does not have standing, the court

lacks subject-matter jurisdiction over a claim, and the case must be dismissed.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* FED. R. CIV. P. 12(h)(3).

"[F]orbidden . . . from acting beyond [their] authority," *NetworkIP, LLC v. Fed. Commc'n Comm'n*, 548 F.3d 116, 120 (D.C. Cir. 2008) (citations omitted), federal courts thus "have an affirmative obligation to consider whether the constitutional and statutory authority exist for us to hear each dispute," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quotation marks and citation omitted).  To assure itself of its jurisdiction over a claim, "a court may consider materials outside the pleadings." *Jibril v. Mayorkas*, 101 F.4th 857, 866 (D.C. Cir. 2024) (brackets omitted) (quoting *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021)).

## B.    Removal and Remand

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction[] may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  A defendant seeking the exercise of federal court jurisdiction over a removed case "bears the burden of pleading" the basis for jurisdiction.  *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 906 (D.C. Cir. 2006) (citation omitted); *see also Kokkonen*, 511 U.S. at 377 ("It is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests upon the party asserting jurisdiction." (citations omitted)).  "When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case."  *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c)).

"[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) (citing *Standard Fire Ins. Co. v. Knowles*, 568 U.S.

588, 595 (2013)).  The Supreme Court has instructed that "CAFA's provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Id*. (quoting S. Rep. No. 109–14, at 43 (2005)).

In determining whether to order remand, courts evaluate a defendant's notice of removal for whether it contains "plausible allegations of the jurisdictional elements," *Salter v. Quality Carriers, Inc.*, 974 F.3d 959, 963 (9th Cir. 2020) (citation omitted), "apply[ing] the same liberal rules to removal allegations as to other matters of pleading,'" *Dart Cherokee*, 574 U.S. at 81, 87 (cleaned up) (on appeal from order granting remand, looking to removal notice and stating federal removal statute "requires only that the grounds for removal be stated in 'a short and plain statement'" in defendant's notice of removal (citing 28 U.S.C. § 1446) (other citation omitted)); *see also Love v. Villacana*, 73 F.4th 751, 755 (9th Cir. 2023) ("[A] removing defendant must allege facts in the notice of removal supporting the existence of subject-matter jurisdiction and Article III standing." (citing *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 661–63 (2019), and 28 U.S.C. § 1446(a)).

## III.   DISCUSSION

The parties agree on two points: first, that this putative class action satisfies the statutory requirements under CAFA for removal to federal court, *see* Pl.'s Mot. at 1; Defs.' Opp'n Pl.'s Mot. Remand ("Defs.' Opp'n") at 5, ECF No. 14; Mot. Hr'g Tr. at 5:6–15 (plaintiff's counsel agreeing that "putting standing aside," plaintiff's suit "meets all of the other requirements" for removal under CAFA), and, second, that plaintiff has statutory standing under the CPPA to bring this action in its representational capacity, *see* Defs.' Opp'n at 5; Pl.'s Mot. at 8–9.

The sole point of contention is whether plaintiff has Article III standing for this Court to exercise jurisdiction upon removal.  On this point, the parties take the inverse of the typical

litigation posture, in which defendants *oppose* plaintiffs' assertion of a sufficient showing to establish Article III standing.  In this remand litigation, by contrast, defendants *advocate* that plaintiff has "standing . . . to support federal jurisdiction," Defs.' Not. Removal ¶ 4, including "[a]t a minimum," *id.* ¶ 22, associational standing to sue "on behalf of its members" and organizational standing to sue "on its own behalf," Defs.' Opp'n at 10, 16 (quoting *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988), and citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  Describing defendants' position as an effort to "foist . . . standing on a plaintiff absent a factual basis for it in the Complaint or removal notice," Pl.'s Reply Supp. Mot. Remand ("Pl.'s Reply") at 3, ECF No. 16, plaintiff seeks remand.  Plaintiff insists that neither associational nor organizational standing applies and denies that this action was brought as "a representative suit on behalf of its members," or that it "suffer[ed] Article III injuries-in-fact simply by expending resources to promote abstract social interests."  Pl.'s Mot. at 2–3 (citation omitted).

Following review of the basis for this Court's CAFA removal jurisdiction and the prerequisites for associational and organizational standing urged by defendants, examination of the record persuades that plaintiff lacks Article III standing to maintain suit in federal court, mandating remand.

### A.    CAFA Jurisdiction Is Satisfied

The parties are correct that this putative class action is removable pursuant to CAFA, *see supra* Part III; Pl.'s Mot. at 1; Defs.' Opp'n at 5; Mot. Hr'g Tr. at 5:6–15, and, to confirm this conclusion as part of this Court's "independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it," *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citation omitted), satisfaction of CAFA's statutory requirements is briefly reviewed.

CAFA confers diversity jurisdiction on federal district courts over "any civil action in which [1] the matter in controversy exceeds the sum or value of $5,000,000 . . .  and [2] is a class

action in which (A) any member of a class of plaintiffs is a citizen of a State different from any

defendant," 28 U.S.C. § 1332(d)(2)(A), so long as [3] the proposed class includes at least 100

members, *id.* § 1332(d)(5)(B).[2]  A "class action," for CAFA purposes, is "any civil action filed

under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial

procedure authorizing an action to be brought by 1 or more representative persons as a class

action."  *Id.* § 1332(d)(1)(B).

Here, defendants have the burden of establishing that each CAFA requirement is met.  *See*

*Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 752 (11th Cir. 2010) ("CAFA does not change

the traditional rule that the party seeking to remove the case to federal court bears the burden of

establishing federal jurisdiction." (citations omitted)); *DiTolla v. Doral Dental IPA of New York*,

469 F.3d 271, 275 (2d Cir. 2006) (same).  They have met this burden.

First, defendants plausibly allege that plaintiff's request for the greater of treble damages

or $1,500 in statutory damages per alleged violation, with "[e]ach night that Hilton charged Junk

Fees constitut[ing] a violation," Compl. ¶¶ 121, 123, satisfies CAFA's greater-than $5 million

amount-in-controversy requirement, *see* Defs.' Not. Removal ¶¶ 18–20; *Dart Cherokee*, 574 U.S.

at 89 ("[A] defendant's notice of removal need include only a plausible allegation that the amount

in controversy exceeds the jurisdictional threshold." (citing 28 U.S.C. § 1446(a)).  Defendants

"operate[] thousands of hotel rooms" in D.C. and "regularly host[] D.C. residents in its hotels

elsewhere," Defs.' Not. Removal ¶ 20, making it reasonable to infer that among the "tens of

thousands or potentially millions of members" of the putative classes, Compl. ¶ 103, a sufficient

---

[2]       In contrast to the general rule that a defendant removing a civil action to federal court on the basis
of diversity jurisdiction must establish complete diversity of citizenship between the parties, *see* 28 U.S.C. § 1332(a),
when the removed case is a "class action," under CAFA, only minimal—rather than complete—diversity between the
parties is required, which occurs when at least one plaintiff and defendant is a citizen of different States, *see id.* §
1332(d)(2)(A); *see also Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 165 (2014).

subset "booked Hilton rooms charging an allegedly violative hotel fee for at least 3,334 nights during the undefined number of 'years' Travelers seeks liability," Defs.' Not. Removal ¶ 20.

Second, defendants' removal allegations suffice to establish that minimal diversity exists among the parties.  Defendants are "citizens of Virginia and Delaware," Defs.' Not. Removal ¶ 15, and allege that plaintiff's proposed "District of Columbia" and "National" classes consisting of "residents of the District of Columbia" and elsewhere in the United States, Compl. ¶¶ 96–97, "necessarily include[] citizens of the District of Columbia" and "States other than Virginia and Delaware," Defs.' Not. Removal ¶ 16, such that "at least one putative class member is a citizen of a State other than Virginia or Delaware," *id.* ¶ 17; *see Momenian v. Davidson*, 878 F.3d 381, 389 (D.C. Cir. 2017) ("Citizenship is determined by domicile[.]" (citation omitted)); *see, e.g.*, *Ehrman v. Cox Commc'ns, Inc.*, 932 F.3d 1223, 1227 (9th Cir. 2019) ("Because [defendants] provided a short and plain statement alleging that [plaintiff] and the putative class members were citizens of California, its jurisdictional allegations were sufficient[.]").  Third, plaintiff's allegation that its putative classes consist of "tens of thousands or potentially millions" of members who "booked a room at a Hilton hotel" and "paid a resort, destination, and/or other similar fee," Compl. ¶¶ 96–97, 103, clears the required threshold that "the proposed class include[] at least 100 members," 28 U.S.C. § 1332(d)(5)(B); *see* Defs.' Not. Removal ¶ 13.

Finally, CAFA's requirement that the action be "filed under rule 23 of the Federal Rules of Civil Procedure *or similar State statute*," 28 U.S.C. § 1332(d)(1)(B) (emphasis supplied), is also met.  In bringing this suit for damages as "as a class action pursuant to D.C. Rule of Civil Procedure 23," Compl. ¶ 95, and alleging compliance with the requirements of numerosity, commonality predominance, typicality, adequacy, and superiority, *see id.* ¶¶ 103–08, plaintiff has "attempted to comply with the D.C. Superior Court's Rule 23 for class actions," *Nat'l Consumers League v.*

*Bimbo Bakeries USA*, 46 F. Supp. 3d 64, 75 (D.D.C. 2014) (citations omitted).  The D.C. Superior

Court Rule 23 is "nearly identical" to Federal Rule of Civil Procedure 23, *Clean Label Project*

*Found. v. Mead Johnson & Co., LLC.*, No. 20-cv-3231 (TSC), 2023 WL 2733723, at *2 (D.D.C.

Mar. 31, 2023), and thus qualifies as a "similar State" rule to meet this last CAFA statutory

requirement.[3]

      With CAFA's statutory requirement for removal jurisdiction satisfied, left to be determined

is whether plaintiff has Article III standing to support federal court jurisdiction.  *See, e.g.*, *Polo v.*

*Innoventions Int'l, LLC*, 833 F.3d 1193, 1196 (9th Cir. 2016) ("The rule that a removed case in

which the plaintiff lacks Article III standing must be remanded to state court under § 1447(c)

applies as well to a case removed pursuant to CAFA as to any other type of removed case."

(citations omitted)).

---

[3]      Failure to establish this last CAFA requirement that the action be "filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute," 28 U.S.C. § 1332(d)(1)(B), frequently triggers remand of removed CPPA suits, for lacking "the hallmarks of Rule 23 class actions . . . or the requirement of class certification," *Mead Johnson & Co., LLC.*, 2023 WL 2733723, at *3 (noting that "private attorney general statutes like the CPPA lack the equivalency to Rule 23 that CAFA demands" (brackets omitted) (quoting *Nat'l Consumers League v. Flowers Bakeries, LLC.*, 36 F. Supp. 3d 26, 36 (D.D.C. 2014))); *see also Int'l Lab. Rts. F. v. Bumble Bee Foods*, LLC, No. 22-cv-1220 (DLF), 2022 WL 16994407, at *2 (D.D.C. Nov. 15, 2022) (same, where plaintiff "did not bring this [CPPA] case as a class action under Rule 23" (citations omitted)); *Clean Label Project Found. v. Abbott Lab'ys, Inc.*, No. 21-cv-3247 (BAH), 2022 WL 1658813, at *7 (D.D.C. May 25, 2022) (same, where plaintiff does not "describe the [CPPA] suit as a 'class action,' define a putative class, or make any attempt to comply with either the federal Rule 23 or the nearly identical D.C. Rule 23 requirements for a class action"); *Pesticides v. Exxon Mobil Corp.*, No. 20-cv-1815 (TJK), 2021 WL 1092167, at *3 (D.D.C. Mar. 22, 2021) (same, where plaintiff "makes no allegations in its [CPPA] complaint about a potential class and did not bring its action under Superior Court Rule of Civil Procedure 23"); *Toxin Free USA v. J.M. Smucker Co.*, 507 F. Supp. 3d 40, 45 (D.D.C. 2020) (same, in CPPA suit, where plaintiff "unequivocally 'disclaimed any intention to seek class certification'" (citation omitted)); *Hackman v. One Brands, LLC*, No. 18-cv-2101 (CKK), 2019 WL 1440202, at *5 (D.D.C. Apr. 1, 2019) (same, where plaintiff "filed suit under the DCCPPA and has declined to pursue her claim as a class action"); *Flowers Bakeries, LLC.*, 36 F. Supp. 3d at 36 (same, in CPPA suit, where "plaintiff has not brought a 'class action' under D.C. Superior Court Rule 23"); *Bimbo Bakeries USA*, 46 F. Supp. 3d at 75–76 (same, in CPPA suit where "there is no procedural element for class certification and no notice provision for would-be class members," and noting that "courts of the D.C. Circuit have generally looked to two factors to determine whether a DCCPPA action is a class action: (1) whether the plaintiff attempted to comply with the D.C. Superior Court's Rule 23 for class actions, and (2) whether the plaintiff sought class certification" (citations omitted)); *Zuckman v. Monster Beverage Corp.*, 958 F. Supp. 2d 293, 305 (D.D.C. 2013) (same, where plaintiff "did not refer to his [CPPA] claim as a class action, and did not seek to comply with any of the D.C. Superior Court's class action rules" (citation omitted)).

B.      **Standing Prerequisites**

"Under Article III, a case or controversy can exist only if a plaintiff has standing to sue[.]"

*United States v. Texas*, 599 U.S. 670, 675 (2023) (citations omitted).   To establish Article III

standing, the party invoking standing—typically, the plaintiff—must plead and, ultimately, prove

three elements: (1) that plaintiff suffered an "injury in fact" that is both "concrete and

particularized" and "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560

(quotation marks and citations omitted); (2) that plaintiff's injury must be "fairly [] trace[able] to

the challenged action of the defendant," meaning that "there must be a causal connection between

the injury and the conduct complained of," *id.* (quotation marks and citation omitted); and (3) that

it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision[,]" *id.* (quotation marks and citation omitted); *see also Brown*, 600 U.S. at 561; *Spokeo,

Inc. v. Robbins*, 578 U.S. 330, 338 (2016).   "Absent such a showing, exercise of its power by a

federal court would be gratuitous and thus inconsistent with the Art. III limitation."   *Town of

Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).   "[E]ach element

must be supported in the same way as any other matter on which the plaintiff bears the burden of

proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

litigation."   *Lujan*, 504 U.S. at 561 (citations omitted).   "At the pleading stage, general factual

allegations of injury resulting from the defendant's conduct may suffice[.]"   *Id.*; *see also Abigail

All.*, 469 F.3d at 132.

Article III standing for an organization may be established in "one of two ways"—it "can

assert standing on its own behalf, as an organization, or on behalf of its members, as associational

standing."   *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 100 (D.C. Cir. 2019) (citing

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 24 (D.C. Cir.

2011)).  Defendants urge that the record before the Court sufficiently shows plaintiff has standing on both bases, but this Court disagrees, as discussed next.

### C.    Plaintiff Lacks Associational Standing

An organization bringing suit on behalf of its members must, as a starting point, "have the 'indicia of a traditional membership association.'"  *Viasat, Inc. v. Fed. Commc'ns Comm'n*, 47 F.4th 769, 781 (D.C. Cir. 2022) (quoting *Sorenson Commc'ns, LLC v. Fed. Commc'ns Comm'n*, 897 F.3d 214, 225 (D.C. Cir. 2018)).   Next, the organization must allege plausibly that "its members would [] have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)); *see also Eagle Cnty., Colorado v. Surface Transp. Bd.*, 82 F.4th 1152, 1171 (D.C. Cir. 2023).

### 1.    *Associational Standing Requirements Must Be Met Upon Filing.*

At the outset, plaintiff argues that associational standing is simply "inapplicable" here since plaintiff's complaint does not assert claims on behalf of either its own members or non-members, and defendants "cannot rewrite" the complaint "to dictate that [plaintiff] bring its lawsuit on behalf of its members when [it] does not wish to do so."  Pl.'s Reply at 4 (capitalization and citation omitted); *see also* Pl.'s Mot. at 13 (citing *Great N. Ry. Co. v. Alexander*, 246 U.S. 276, 282 (1918), and *WE Charity v. Canadian Broad. Corp.*, 679 F. Supp. 3d 1, 18 (D.D.C. 2023)).  To begin, as plaintiff itself concedes, CAFA permits defendants to remove a putative class action to federal court and supplement jurisdictional allegations in their removal notice to establish subject-matter jurisdiction, *see* Mot. Hr'g Tr. at 15:22–16:3 (plaintiff's counsel agreeing that "the notice of removal should be treated in the factual allegations and [] should be treated essentially like the

complaint['s] allegations"); *see also Dart Cherokee*, 574 U.S. at 84–85 (stating "CAFA gives federal courts jurisdiction over certain class actions" that satisfy statutory requisites, and noting defendants' "notice of removal alleged that all three requirements were satisfied" (citations omitted)).  Defendants are not, then, "rewrit[ing]" plaintiff's complaint, Pl.'s Mot. at 13, but rather alleging, on the basis of the complaint and Notice allegations, that associational standing is satisfied here, *see* Defs.' Opp'n at 13–14, which is a determination to be made by this Court, *see Jibril*, 101 F.4th at 866 (district court has an "'independent obligation' to assure itself that it ha[s] subject-matter jurisdiction" (citation omitted)).

To be sure, the four corners of the complaint make no assertion about any of plaintiff's members being injured, *see generally* Compl.; Pl.'s Reply at 4, though at the hearing, plaintiff conceded that such a member could potentially be found, *see* Mot. Hr'g Tr. at 26:5–11 (plaintiff's counsel stating that "maybe there is . . . within those actually dues-paying members there is somebody").  The crux of plaintiff's standing objection, then, is that the complaint asserts CPPA claims on behalf of non-members and puts this complaint outside the realm of what associational standing may bear for the exercise of Article III standing.  Defendants respond that, at this pre-class certification stage, plaintiff and its members are the only party relevant to the standing inquiry.  Defs.' Opp'n at 9.  On this point, defendants are correct.[4]

_____

[4]     Defendants further respond to plaintiff's reliance on non-members to defeat associational standing by arguing that were nonnamed class members considered for purposes of Article III standing at this remand stage, associations are not constitutionally barred from "having derivative standing to represent non-members through their members."  Defs.' Opp'n at 9.  Such derivative standing would require a showing that "(1) the party asserting the right has a close relationship with the person who possesses the right and (2) there is a hindrance to the possessor's ability to protect its own interests."  *Metro. Washington Chapter, Associated Builders & Contractors, Inc. v. Dist. of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023) (quotation marks and brackets omitted) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)); *see also* Pl.'s Reply at 6–7.  Notably, other than conclusory references to derivative standing, defendants did not otherwise address this standard.  *See* Defs.' Opp'n at 9–11; *see also* Mot. Hr'g Tr. at 50:5–6 (defendants' counsel not addressing Court's question "how those narrow circumstances" of derivative standing "can be met here").  The cases cited by defendants for derivative standing by an association are inapposite since the organizations at issue in those cases had obvious and close relationships with the non-parties who possessed the right being vindicated in the complaint and for whom derivative standing was found appropriate.  Defs.' Opp'n at 10–11 (citing *Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 289, 291 (3d Cir. 2002) (holding

As defendants posit, "[r]emand turns solely on whether this Court has jurisdiction and, as framed by the parties, on whether *Travelers* has standing." *Id.* (emphasis supplied).  This is because putative class members, including those who are not members of plaintiff's organization, "can neither preserve federal jurisdiction in the absence of [plaintiff's] standing nor defeat standing by the possibility that they may become relevant in the future." *Id.*  Put differently, because a "nonnamed class member is not a party to the class-action litigation before the class is certified," plaintiff is, at this stage, the only party relevant to the standing inquiry. *Standard Fire Ins. Co.*, 568 U.S. at 593 (brackets and emphasis omitted) (quoting *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011)).

This principle is consistent with authority examining, at the pre-class certification stage, whether the named plaintiff—not nonnamed putative class members—satisfies the prerequisites

---

"Society's member psychiatrists would have third-party standing to assert the claims of their patients," since "patients' relationships with their psychiatrists fulfills th[e] requirement" of possessing "a sufficiently close relationship which will permit the physicians to effectively advance their patients' claims" (quotation marks and citation omitted)), and *Fraternal Ord. of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) (holding organization of chief law enforcement officers ("CLEO") has standing to assert its CLEO members' third-party claims on behalf of subordinate law enforcement officers), *on reh'g*, 173 F.3d 898 (D.C. Cir. 1999))).  By contrast, here, defendants have made no effort to explain—and this Court is hard pressed to see—how one of plaintiff's members with standing could establish having a "close relationship" to a non-member among plaintiff's putative consumer classes, where nothing binds the two, other than that both may have "booked a room at a Hilton hotel within the United States for personal use and paid a resort, destination, and/or other similar fee to Hilton." Compl. ¶¶ 96–97.

Nor have defendants made clear what "hindrance" exists to any non-member "protect[ing] its own interests." *Metro. Washington Chapter, Associated Builders & Contractors, Inc.*, 62 F.4th at 573 (brackets omitted) (quoting *Kowalski*, 543 U.S. at 130)); *cf.* Defs.' Opp'n at 10–11 (citing *Fraternal Ord. of Police*, 152 F.3d at 1002 (concluding "the presence of CLEOs as members gives the [organization] standing to makes these claims as well," since "any CLEO who gave a firearm to a law enforcement officer . . . would be liable himself," so "his compliance (i.e., *not* supplying the officer with the gun) would indeed defeat the right-holder's interest" (emphasis in original) (citation omitted)); *Pa. Psychiatric Soc.*, 280 F.3d at 290 (concluding "the mental health patients face obstacles to pursuing litigation themselves" since "the patients' fear of stigmatization, coupled with their potential incapacity to pursue legal remedies, operates as a powerful deterrent to bringing suit")).

Defendants additionally cite *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988), in which the Supreme Court held that plaintiff "consortium has standing to sue on behalf of its member associations as long as those associations would have standing to bring the same challenge," but that case merely recognized the principle, quoted by defendants, that "an association has standing to sue on behalf of its members when those members would have standing to bring the same suit," Defs.' Opp'n at 10 (quoting *id.*); *see also* Defs.' Resp. Pl.'s Not. Suppl. Auth. at 2, ECF No. 18 (citing *id.*).  In sum, defendants have not adequately shown plaintiff (or its members) have derivative standing on behalf of non-members to confer associational standing on plaintiff here.

for Article III standing.  *See, e.g.*, *Am. Chiropractic Ass'n v. Am. Specialty Health Inc.*, 625 F. App'x 169, 176 (3d Cir. 2015) (in putative class action brought by association and two individuals, finding no associational standing where plaintiff association failed to establish that "neither its claims nor its requested relief 'require[d] the participation of individual members in the lawsuit,'" without considering nonnamed class members (quoting *Hunt*, 432 U.S. at 343)).  Notwithstanding that plaintiff brings this action on behalf of putative consumer classes not limited to its own members, the associational standing inquiry focuses on whether plaintiff's "*members* would have standing to sue in their own right." *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. at 169 (emphasis supplied).  This focus does not shift to potential non-member putative class members because the "doctrine of associational standing does not subsume Rule 23." *Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1456 (D.C. Cir. 1988).  "Indeed, the Supreme Court has rejected the argument that associational standing and Rule 23 are designed to serve precisely the same purpose." *Id.* (quotation marks omitted) (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986)).  Thus, in determining whether plaintiff has standing at this pre-certification stage, defendant is correct that nonnamed class members do not "defeat standing by the possibility that they may become relevant in the future."  Defs.' Opp'n at 9.

Plaintiff resists this conclusion, pointing out that "pre-class certification, putative class definitions often bear on important legal issues," Pl.'s Reply at 5–6 (citing *Bradford v. George Wash. Univ.*, 249 F. Supp. 3d 325, 334 (D.D.C. 2017), and *Trujillo v. Chef's Warehouse W. Coast LLC*, No. 19-cv-8370 (DSF) (MAAx), 2020 WL 7315346, at *3 (C.D. Cal. Oct. 19, 2020)), but this adds nothing to the dispute here.  Plaintiff's cited cases indicate only that courts may examine putative class members to determine whether the defendant has removal jurisdiction pursuant to

CAFA, *see id.* (citing *Bradford*, 249 F. Supp. 3d at 334), and may order pre-certification discovery of putative class members to inform a determination of whether to certify the action as a class action, *see id.* at 6 (citing *Trujillo*, 2020 WL 7315346, at *3–6 (authorizing pre-certification discovery "likely to produce persuasive information substantiating the class action allegations" (citation omitted)).   In short, CAFA removal jurisdiction and plaintiff's ability adequately to represent proposed classes under Rule 23 are different inquiries from, with little bearing on, the issue of whether plaintiff has associational standing to pursue a claim in federal court.  *See, e.g.*, *Brock*, 477 U.S. at 289 (explaining the "special, advantageous both to the individuals represented and to the judicial system as a whole, that distinguish suits by associations on behalf of their members from class actions"); *Frazier*, 851 F.2d at 1456 (observing that the district court's finding of associational standing "was irrelevant to its analysis of the propriety of class certification pursuant to Rule 23," and affirming denial of class certification).[5]

---

[5]        Plaintiff cites multiple decisions for the principle that "associational standing does not apply to organizations that bring actions on behalf of non-members," because "organizations cannot assert associational standing to represent putative classes 'not limited to' the organization's membership." Pl.'s Mot. at 12  (collecting cases); *see also* Pl.'s Reply at 4–5.  Yet, the majority of cases relied upon by plaintiff are inapposite since they do not involve a putative class action at all, and thus do not persuade that associational standing is *per se* unavailable at the pre-certification stage when plaintiff is suing on behalf of a putative class comprised, in part, of non-members of the organization.  *See* Pl.'s Mot. at 12 & n.7; Pl.'s Reply at 5 (citing *Am. Legal Found. v. F.C.C.*, 808 F.2d 84 (D.C. Cir. 1987); *Pa. Psychiatric Soc., Inc.*, 280 F.3d 278; *Nestle Ice Cream Co. v. N.L.R.B.*, 46 F.3d 578 (6th Cir. 1995); *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544 (Fed. Cir. 1986); *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, 42 F. Supp. 3d 125 (D.D.C. 2014); *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, No. 08-cv-487, 2017 WL 2539451 (S.D. Tex. Feb. 15, 2017)).  The remaining cases cited by plaintiff, in which courts found that plaintiff associations lacked standing to sue on behalf of putative classes comprised of non-members, did not involve the specific question at issue here of standing sufficient for removal, but rather considered the dual inquiries of whether an association has Article III standing and is an adequate class representative under Federal Rule of Civil Procedure 23, in the context of a motion to dismiss the suit.  *See* Pl.'s Mot. at 12; Pl.'s Reply at 4–5 & n.4 (citing *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, No. 18-cv-63130 (UU), 2019 WL 9093460, at *8–9 (S.D. Fla. June 21, 2019) (ordering dismissal of certain claims for lack of associational standing since "an association may only bring suit on behalf of its members and the putative [] class is not limited to [plaintiffs'] members" (citation omitted)); *Fla. Educ. Ass'n v. Fla.*, No. 17-cv-414 (RH) (CAS), 2018 WL 10560520, at *2 (N.D. Fla. June 8, 2018) (on motion to dismiss for failure to state a claim, recognizing that association "as an individual plaintiff—that is, other than in its capacity as a class representative, if a class is eventually certified . . . cannot pursue claims of nonmembers"); *In re: Takata Airbag Prods. Liab. Litig.*, 2016 WL 1266609, at *6 (S.D. Fla. Mar. 11, 2016) (dismissing count for lack of standing, since "the Complaint does not limit the automotive recycler putative classes only to [plaintiff's] members" so plaintiff "is not suing pursuant to the rights of its members" (citation omitted)).  In these contexts, unlike here, the conflation of the two inquiries may serve judicial efficiency, benefited by full briefing from the parties.

Agreeing with defendants on this point, however, does not put defendants over the finish line as sufficiently establishing plaintiff's associational standing.  Merely because the putative classes may encompass nonmembers of plaintiff as an organization, does not automatically settle the question of whether plaintiff has associational standing to pursue its CPPA claim as a class action in this Court.  Consideration of the required elements of associational standing persuades that those requirements are not met here.  The allegations in the complaint and Notice, taken together, fall short of establishing that plaintiff "qualifies as a membership association," *Viasat, Inc.*, 47 F.4th at 781, and in any event, plaintiff's request for money damages precludes satisfaction of the third required element that "neither the claim asserted nor the relief requested requires the member to participate in the lawsuit," *Eagle Cnty., Colorado*, 82 F.4th at 1171 (citation omitted).

### 2.    *Insufficient Showing That Plaintiff Is a Membership Association.*

While plaintiff correctly states that the "applicability of associational standing is a 'threshold' question preceding any analysis of its elements," Pl.'s Reply at 4 (quoting *Am. Legal Found.*, 808 F.2d at 89), neither party addressed in their briefing the actual threshold requirement for associational standing—namely, whether plaintiff "qualifies as a membership association," *Viasat, Inc.*, 47 F.4th at 781.  This inquiry "turns on considerations such as whether members finance the organization, guide its activities, or select its leadership."  *Id.* (citations omitted).  "[I]t is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page."  *Id.* (citations omitted).  In *Viasat*, for example, the D.C. Circuit found that an environmental group, which provided "no insight into how it relates with its members," fell short of meeting this element, where affidavits submitted by two purported group members did not "describe[] involvement in the Group beyond a bare assertion of membership," and "the Group's own affidavit, submitted by its operating officer, ma[de] no reference to membership."  *Id.* at 781–82; *see also Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 435 (D.C. Cir.

2002) (finding magazine, which advocated for decriminalization of marijuana, lacked associational standing given absence of evidence that "its readers and subscribers played any role in selecting its leadership, guiding its activities, or financing those activities" (quotation marks omitted) (citing *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 26 (D.C. Cir. 2002)); *Am. Legal Found.*, 808 F.2d at 90 (declining to "conclude . . . that the organization before us is the functional equivalent of a traditional membership organization" where organization "serves no discrete, stable group of persons with a definable set of common interests" and "it does not appear from the record that [plaintiff's] 'supporters' play any role in selecting [plaintiff's] leadership, guiding [its] activities, or financing those activities").

Here, as in *Viasat*, this Court is "left with no basis to determine whether" this threshold element of associational standing has been met, *Viasat, Inc.*, 47 F.4th at 782—an issue on which defendants, as the "party supporting removal[,] bear[] the burden," *D.C. v. Vizion One, Inc.*, No. 21-cv-1071 (TSC), 2022 WL 522980, at *1 (D.D.C. Feb. 22, 2022) (quoting *Doe v. Georgetown Synagogue-Kesher Israel Cong.*, 118 F. Supp. 3d 88, 92 (D.D.C. 2015)).  The complaint does not describe plaintiff as a membership association, let alone allege that plaintiff's members pay dues, vote on leadership, or otherwise guide its operation in a manner indicative of a "traditional membership association." *Viasat, Inc.*, 47 F.4th 781 (quoting *Sorenson Commc'ns, LLC*, 897 F.3d at 225); *see generally* Compl.  Although defendants make the conclusory assertion that plaintiff has "long presented itself as a membership organization with tens of thousands of members who travel," Defs.' Opp'n at 1–2, defendants otherwise allege nothing related to plaintiff's status as a membership association, *see generally* Defs.' Not. Removal.

To bolster their assertion that plaintiff qualifies as a membership association, defendants pointed, during the motions hearing, to the complaint's description of plaintiff's organizational

mission, as well as defendants' removal notice allegations that plaintiff's membership numbers increased to nearly 50,000 between 2015 and 2020, and that "at least one of those 50,000 members" can be reasonably inferred to fall within one of plaintiff's two proposed classes. Defs.' Not. Removal ¶¶ 27–28; *see* Mot. Hr'g Tr. at 54:7–14, 55:4–57:6; Compl. ¶¶ 13, 106. As this Court emphasized at the hearing, however, plaintiff's mission and membership numbers are simply irrelevant to the inquiry of "how [plaintiff] *relates* with its members," *Viasat, Inc.*, 47 F.4th at 781 (emphasis supplied); *see* Mot. Hr'g Tr. at 56:11–57:6 (Court observing "there is nothing in either the notice of removal or the complaint . . . that meets the threshold criteria that the D.C. Circuit has said . . . is required to meet the threshold indicia of a membership organization"); *Gettman*, 290 F.3d at 435 (concluding plaintiff "has no basis for asserting associational standing, no matter how 'committed to the decriminalization of marijuana' it may be" (citation omitted)). Defendants, who bear the burden, have not sufficiently alleged that the threshold requirement of associational standing is met. *See Sorenson Commc'ns, LLC*, 897 F.3d at 223, 225 (dismissing for lack of associational standing where, among other deficiencies, record was "unclear" whether plaintiff is "the sort of organization that would qualify as a 'membership association'" (citation omitted)).[6]

### 3. *Requested Damages Relief Here Precludes Associational Standing.*

Even assuming plaintiff "qualifies as a membership association," *Viasat, Inc.*, 47 F.4th at 781, has a member with standing "to sue in his own right," and seeks to protect an interest "germane to its purpose," *Eagle Cnty., Colorado*, 82 F.4th at 1171 (citation omitted), the last element to establish associational standing requires that "neither the claim asserted nor the relief requested requires the member to participate in the lawsuit," *id*. (citation omitted); *see also Hunt*,

---

[6]     Notably, despite this shortcoming being pointed out at the hearing, defendants have taken no opportunity since then to supplement the record.

432 U.S. at 343.  Plaintiff's request for relief in the form of money damages makes meeting the last element impossible here and, consequently, forecloses associational standing.

As to the first element—that "at least one of the identified [] members suffers injury-in-fact fairly traceable to the challenged action that is likely to be redressed by a favorable decision," *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67 (D.C. Cir. 2022) (citing *Lujan*, 504 U.S. at 560–61)—plaintiff stated that it was "certainly plausible, but it might not be true" that one of its members would overlap with its proposed classes of consumers whom plaintiff alleges defendants injured, Mot. Hr'g Tr. at 45:5–6; *id.* at 26:5–11 (plaintiff's counsel stating that "maybe there is . . . within those actually dues-paying members there is somebody . . . [b]ut I don't know, and I don't think that's been plausibly alleged").  Applying the "liberal rules [applicable] to removal allegations," *Dart Cherokee*, 574 U.S. at 87 (brackets and citations omitted), "it is certainly reasonable to infer that at least one of [plaintiff's] 50,000 members" falls within plaintiff's putative classes of consumers who suffered "actual injuries as a result of Hilton's unfair and deceptive practices," Defs.' Not. Removal ¶ 28 (citation omitted); Compl. ¶ 120, which injury-in-fact would be redressable by a decision awarding injunctive relief, damages, or other requested relief, Compl. ¶ 123; *see Public Citizen v. F.T.C.*, 869 F.2d 1541, 1551–53 (D.C. Cir. 1989) (finding associational standing where, "[t]o make out their case, the organizations need show . . . than that they sue on behalf of members who have adolescent children who will be exposed to the promotional messages," and "[c]ommon sense compels the conclusion that among the organizations' three million members, there are many who have adolescent children, and many of those children are surely males, the subgroup Congress identified as most at risk"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . .

. be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." (citation omitted)).

As to the second element—germaneness—plaintiff concedes this is met, and this Court agrees. *See* Mot. Hr'g Tr. at 26:15–19. Germaneness is "satisfied by a 'mere pertinence' between litigation subject and an organization's purpose," *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 111 (D.C. Cir. 1990) (citations omitted), and that standard is easily satisfied here. Plaintiff seeks to enjoin Hilton's "junk fee practices" and obtain damages on behalf of consumers injured by these practices. Compl. ¶¶ 30, 123 (capitalization omitted). These interests are plainly germane to plaintiff's mission "to improve and enhance travel for consumers," including by "advocating against hidden hotel fees both federally and locally in the District." *Id.* ¶ 13; *see also* Pl.'s Not. Suppl. Auth., Ex. A at 1, 6, *Travelers United, Inc. v. Sonesta Int'l Hotels Corp.*, No. 2023-CAB-5254 (D.C. Super. Mar. 21, 2024), ECF No. 17-1 (in suit brought by this plaintiff alleging defendant hospitality company's junk fee practices violated CPPA, holding plaintiff, which "participates in lobbying efforts to promote legislation restricting" fees, "pled a sufficient nexus to the interests of the consumers" for CPPA statutory standing).

This leaves the third element, which the Supreme Court has described as "a prudential one." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996). Citing authority that "[p]rudential standing is . . . a forfeitable issue," Defs.' Opp'n at 8 (quoting *Competitive Enter. Inst. v. Fed. Commc'ns Comm'n*, 970 F.3d 372, 380 (D.C. Cir. 2020), and citing *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 316–17, 354 n.4 (2020), *abrogated by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)), defendants urge that plaintiff has forfeited any argument as to this third element by failing to raise an objection in its remand papers. This argument falls flat on both factual and legal grounds.

Defendants contend that plaintiff "opted to not dispute this prudential requirement," Defs.'
Opp'n at 8 (citations omitted), and indeed plaintiff stated that it "does not contest this, or any,
element of associational standing," Pl.'s Reply at 4.  Yet, plaintiff's purported disclaiming of any
intent to contest the third element must be read in the context of its argument at the threshold that
"associational standing does not apply," with the result that, in plaintiff's view, any discussion of
the applicability of any element would be irrelevant.  Pl.'s Reply at 4; *see also* Pl.'s Mot. at 11–
12.  Asserting, vigorously, that an argument by an opposing party is both "irrelevant," Pl.'s Mot.
at 13, and "inapplicable," Pl.'s Reply at 4, does not amount to a concession as to the third
prerequisite for a finding associational standing.

Moreover, defendants rest their forfeit argument on the assumption that any prudential
matter is forfeitable, but this assumption is faulty.  The D.C. Circuit has made clear that the "Circuit
recognizes prudential standing as jurisdictional," *Sundel v. United States*, 985 F.3d 1029, 1031 n.2
(D.C. Cir. 2021) (citing *Ass'n of Battery Recyclers, Inc. v. E.P.A.*, 716 F.3d 667, 674 (D.C. Cir.
2013) (per curiam)), which "jurisdictional issue . . . cannot be waived or conceded," *Ass'n of
Battery Recyclers, Inc.*, 716 F.3d at 674 (citations omitted); *see also Scenic Am., Inc. v. United
States Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) ("Although a party cannot forfeit a
claim that we lack jurisdiction, it can forfeit a claim that we possess jurisdiction." (citation
omitted)).[7]

In any event, "a federal court cannot act in the absence of jurisdiction," and "jurisdictional
issues may be raised by the court *sua sponte*."  *Am. Libr. Ass'n v. F.C.C.*, 401 F.3d 489, 492 (D.C.
Cir. 2005) (citations omitted); *see also Middleton v. Pratt*, No. 21-cv-2301 (RC), 2022 WL
3910551, at *7 (D.D.C. Aug. 31, 2022) ("Putting aside Plaintiffs' defective challenge, this Court

---

[7]     Again, despite bearing the burden to establish associational standing, defendants submitted no
supplemental briefing on the issue, despite their offer to do so at the hearing.  *See* Mot. Hr'g Tr. at 53:11–12.

must still assure itself it has jurisdiction." (citing *Am. Libr. Ass'n*, 401 F.3d at 492)).  Here, that requires determining whether associational standing's third required element is met, notwithstanding defendants' flawed forfeit argument and plaintiff's unhelpful disclaiming of any intent to "contest this, or any, element of associational standing,"  Pl.'s Reply at 4; *see* Mot. Hr'g Tr. at 52:23–25 (Court observing, "[I]t makes no sense to me how it can be waived.  I have to find it or not as a jurisdictional issue.").

Turning to this third element, which demands that "neither the claim asserted nor the relief requested requires the member to participate in the lawsuit," *Eagle Cnty., Colorado*, 82 F.4th at 1171 (quoting *Ctr. for Biological Diversity v. Env't Prot. Agency*, 861 F.3d 174, 182 (D.C. Cir. 2017)), the requirement has "been understood to preclude associational standing when"—as here—"an organization seeks damages on behalf of its members," *United Food & Com. Workers Union Loc. 751*, 517 U.S. at 554; *see* Compl. ¶ 123(c)–(e) (seeking award of actual damages, the greater of treble damages or statutory damages, and punitive damages).

As to this limitation, the D.C. Circuit's decision in *Air Transport Association of America v. Reno*, is instructive.  80 F.3d 477 (D.C. Cir. 1996).  In that case, involving an airline association's challenge to agency policies requiring airlines to pay the detention-related expenses of certain travelers who entered the United States without a visa or proper documentation, the D.C. Circuit found the airline association lacked standing to "seek an order requiring the government to compensate [the association's] members for detention expenses they [] previously paid," since "the determination of such monetary relief would require detailed, individualized proof of the members' damages."  *Id.* at 478.  In other words, the "damages claims [were] not common to the entire membership, nor shared by all in equal degree," so "there [was] simply no way the extent of the harm to the [association's] members [could] be determined without individualized proof."

*Id.* at 483 (quotation marks and citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 515–16 (holding association of construction firms seeking damages lacked standing, where "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," such that "each member . . . who claims injury . . . [must] be a party to the suit, and [plaintiff] has no standing to claim damages on his behalf").

Binding authority has articulated "no *per se* rule that associations may never represent their members when monetary relief is immediately at stake," *Telecomms. Rsch. & Action Ctr. on Behalf of Checknoff v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1096 (D.C. Cir. 1986), since, in certain situations, "monetary relief can be awarded without 'individualized proof,'" *Reno*, 80 F.3d at 484. At the same time, "[b]ecause claims for monetary relief often require such an individual inquiry, associations 'generally' cannot sue for monetary damages." *Am. Chiropractic Ass'n*, 625 F. App'x at 176 (citations omitted). Thus, "the question in each case is whether the monetary relief can be awarded without 'individualized proof.'" *Reno*, 80 F.3d at 484; *see Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) ("[W]here the organization seeks a purely legal ruling without requesting that the federal court award individualized relief to its members, the *Hunt* test may be satisfied." (citing *Hunt*, 432 U.S. 333)). Individual participation may not be necessary in situations in which, for example, the amount of damages is statutorily prescribed, or where damages are "calculated by applying a simple formula" that requires a court only to "fill in the blanks." *Telecomms. Rsch. & Action Ctr.*, 806 F.2d at 1095–97 (reserving decision whether damages that may "be calculated by applying a simple formula" requires "the participation of the individuals affected").

26

The Supreme Court has provided guidance on when an association may seek damages with monetary benefits to members and still meet the last element for associational standing. Specifically, when a union sought injunctive relief that, if awarded, would have resulted in benefits payments to union members, the union could "litigate th[e] case without the participation of those individual claimants," since "the unique facts of each [union] member's claim" for benefits allegedly owed would be determined by state authorities and "the suit raise[d] a pure question of law: whether the Secretary [of Labor] properly interpreted the Trade Act's . . . eligibility provisions." *Brock*, 477 U.S. at 287–88.  This is not the situation here.

While plaintiff seeks statutory damages, which could conceivably be awarded without individualized damages calculations, defendants themselves stated that the determination of any statutory damages award would be "more complicated than simply looking at defendants' records" of the number of class members injured multiplied by the statutorily prescribed award.  Mot. Hr'g Tr. at 64:24–65:2.  Even assuming "individualized proof" would not be necessary for an award of statutory damages, *Reno*, 80 F.3d at 484, however, plaintiff also seeks "actual damages," Compl. ¶ 123(c), which damages claims would "not [be] common to the entire membership, nor shared by all in equal degree[,]" *Reno*, 80 F.3d at 483 (citation omitted).  Indeed, the individual-participation analysis in this case is more straightforward than in *Reno*, where plaintiff airline association sought not money damages outright, but "declaratory relief [that] create[d] an entitlement to subsequent monetary relief," *Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 194 (D.D.C. 2007) (citing *Reno*, 80 F.3d 477), which the Circuit found fatal to the association's claim for standing, since "individualized proof would definitely be required," *Reno*, 80 F.3d 484 (citations omitted).  As in *Reno* and as defendants themselves concede, *see* Mot. Hr'g Tr. at 64:17–65:2, plaintiff's request for actual and statutory damages for every putative class member that

"booked a room at a Hilton hotel . . . and paid a resort, destination, and/or other similar fee to Hilton," Compl. ¶¶ 96–97, would plainly "require detailed and individualized proof" from each putative class member, *Reno*, 80 F.3d at 484.[8]

Notwithstanding this precedent, with which defendants neither grapple nor even address, defendants contend, in their removal notice, that plaintiff "seeks damages solely through a putative class action, [] which does not require its members 'to participate as a named plaintiff in the lawsuit.'" Defs.' Not. Removal ¶ 26 (quoting *Ctr. for Bio. Diversity*, 861 F.3d at 182). Yet, the case on which defendants rely for this statement is wholly inapposite, since unlike here, *Center for Biological Diversity* did not involve a request for money damages. *See Ctr. for Bio. Diversity*, 861 F.3d at 182 (finding third element satisfied since "neither the claim asserted . . . nor the relief requested," which was an "order requiring EPA to complete consultation and to report back to this Court," "require[d] any Center member to participate as a named plaintiff in the lawsuit" (quotation marks omitted)). In a last gasp effort, defendants further argue that the issue of individual members' participation need not be reached, if at all, until the class certification stage. As defense counsel put it at the motions hearing, "there would not be a reason for [putative class members] to need to participate in this suit until the class certification stage because what would trigger or invoke the need for their participation in some way would be a proving-up damages[.]" Mot. Hr'g Tr. at 61:6–9; *id.* at 62:9–17, 65:2–7 (suggesting that individual proof of damages only becomes relevant at class certification stage). Defendants urging a finding of plaintiff's forfeit or

---

[8]    While standing and class certification are distinct inquiries, *see Frazier*, 851 F.2d at 1456, the parties' arguments as to whether plaintiff's suit for damages "requires the participation of individual members in the lawsuit," *Reno*, 80 F.3d at 483 (citation omitted), may sit in tension with plaintiff's burden at the class certification stage to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members," D.C. Super. R. Civ. P. 23(b)(3), and with arguments defendants may raise in opposition, *see* Mot. Hr'g Tr. at 58:14–59:10 (Court asking defense counsel how defendants will "show that plaintiff's claim does not depend on an individual proof . . . in order for defendants to prevail on its [remand] motion," noting that at the class certification stage defendants likely will argue the "need [for] individualized proof").

postponing any concerns about individual damages until class certification, are merely transparent efforts to gloss over the obvious problem posed by the plaintiff's requested monetary, actual damages relief, which prevents satisfaction of the third element for associational standing.  These arguments fail.  Foundational principles of Article III standing instruct that "individual named plaintiffs representing a class must have standing to pursue their own individual claims *at the time the suit was filed*."  *Garnett v. Zeilinger*, 323 F. Supp. 3d 58, 65 (D.D.C. 2018) (emphasis supplied) (citing 1 Newberg on Class Actions § 2:3 (5th ed.)); *see Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("While the proof required to establish standing increases as the suit proceeds . . . the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." (emphasis supplied) (citations omitted)).  This principle is reflected in the few cases presenting the issue of associational standing asserted on behalf of a putative class, which examine the satisfaction—or not—of the third element of associational standing at the point in time when plaintiff's standing is called into question.  *See Am. Chiropractic Ass'n*, 625 F. App'x at 176 (in putative class action, affirming dismissal of chiropractor association's claims for lack of associational standing, since although "an individual member[] has standing, he only seeks monetary reimbursement," "a type of relief that associations generally are not permitted to pursue on their members' behalf," and association "has not shown that any of its members possess standing to seek non-monetary relief" (citations omitted)).[9]

---

[9]    In certain factual scenarios issues of class certification and jurisdiction may be so intertwined that both are appropriately presented together, for example, when class certification issues are "logically antecedent to Article III concerns . . . and themselves pertain to statutory standing," such that "the issue about Rule 23 certification should be treated" before jurisdiction, "mindful that the Rule's requirements must be interpreted in keeping with Article III constraints[.]"  *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (quotation marks, brackets, and citations omitted).  That is not the case here, both because the parties raise no dispute regarding plaintiff's undisputed statutory standing under the CPPA to bring this representational lawsuit on behalf of consumers, *see* Pl.'s Mot. at 8–9; Defs.' Opp'n at 5, and, in fact, agreed to address class certification as a wholly separate issue from jurisdictional standing*, see* Min. Order (Jan. 2, 2024) (upon consent motion of defendants, directing "plaintiff to file any motion for class certification within six months of [a] ruling" on plaintiff's motion to remand).

In sum, while the Court is satisfied at the pleading stage that "at least one of [plaintiff's] members would have standing to sue in his own right" and "the interest [plaintiff] seeks to protect is germane to its purpose," *Eagle Cnty., Colorado*, 82 F.4th at 1171 (citation omitted), the insufficiency of allegations that plaintiff "qualifies as a membership association," *Viasat, Inc.*, 47 F.4th at 781, together with plaintiff's request for money damages, preclude satisfaction of the threshold and third elements, and thus defeat a finding of associational standing here.

### D.  Plaintiff Lacks Organizational Standing

Defendants also contend that plaintiff has organizational standing to bring suit on its own behalf, since "[p]laintiff organization's mission . . . to improve and enhance travel for consumers" is plainly in "direct conflict" with defendants' "alleged conduct," Defs.' Opp'n at 16 (quotation marks and citation omitted), and it is "plausible at this stage that the facts will ultimately establish the requisite 'injury to [Travelers's] activities—with the consequent drain on [its] resources,'" *id.* (alterations in original) (quoting *Havens Realty Corp.*, 455 U.S. at 379).  Plaintiff responds that "an organization's routine spending to raise awareness about its societal interests" does not constitute an injury-in-fact.  Pl.'s Reply at 2; *see also* Pl.'s Mot. at 14–17.[10]  Plaintiff has the better argument.

#### 1.  *Organizational Standing Requirements*

"To determine organizational standing, we 'conduct the same inquiry as in the case of an individual,'" *Viasat, Inc.*, 47 F.4th at 780–81 (quoting *Havens Realty Corp.*, 455 U.S. at 378),

---

[10]      Plaintiff makes the point that it does not "allege it has ever been charged Junk Fees by Hilton or otherwise injured by Hilton's practices," but rather "seek[s] relief on behalf of classes of consumers pursuant to CPPA Section 28-3905(k)(1)(D)(i)—a statutory basis that, alone" "does not create or require an Article III injury-in-fact." Pl.'s Mot. at 8, 11.  The injury-in-fact inquiry for organizational standing, however, turns not on whether plaintiff suffered the injury of that of an individual member, but rather, as plaintiff acknowledges, *see* Pl.'s Mot. at 14–17, on whether plaintiff has "suffered a concrete and demonstrable injury to its activities" as an organization in other ways, *PETA*, 797 F.3d at 1093 (brackets, quotation marks, and citations omitted), and that is the focus of defendants' jurisdictional allegations.

which "requires [the organization] . . . to show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision,'" *People for the Ethical Treatment of Animals ("PETA") v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (citations omitted).  "The key issue is whether [the organization] has suffered a concrete and demonstrable injury to its activities."  *Id.* (quotation marks, brackets, and citations omitted).  "A mere setback to the organization's abstract social interests is not enough." *Viasat, Inc.*, 47 F.4th at 781 (quotation marks and citation omitted).  "To determine whether an organization's injury is 'concrete and demonstrable' or merely a 'setback' to its 'abstract social interests' . . . we ask, first, whether the agency's action or omission to act 'injured the [organization's] interest' and, second, whether the organization 'used its resources to counteract that harm.'"  *PETA*, 797 F.3d at 1094 (alterations in original) (citations omitted); *see also Concerned Household Elec. Consumers Council v. Env't Prot. Agency*, No. 22-1139, 2023 WL 3643436, at *3 (D.C. Cir. May 25, 2023), *cert. denied*, 144 S. Ct. 497 (2023).  This two-pronged inquiry, in short, requires a showing of clear injury to organizational interests, and then direct harm, either actual or threatened, in the form of resource expenditures to mitigate the specific injury.

As to the injury requirement, the challenged conduct must have "perceptibly impaired the organization's ability to provide services," or in other words, "cause[d] an inhibition of the organization's daily operations," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quotation marks, brackets, and citations omitted); *see also Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 37 (D.D.C. 2018), *aff'd sub nom. Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020).  "Additionally, the organization must show 'the presence of a direct conflict between the defendant's conduct and the organization's mission.'"  *Elec. Priv. Info.*

*Ctr. ("EPIC") v. Fed. Aviation Admin.*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) (citation and emphasis omitted); *see also Feld Entm't, Inc.*, 659 F.3d at 25 ("If the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, we have found it 'entirely speculative' whether the challenged practice will actually impair the organization's activities." (citation omitted)). As to the second element, "an organization does not suffer an injury in fact where it 'expends resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Vilsack*, 808 F.3d at 920 (brackets and citations omitted).

## 2.  *Plaintiff Has Not Suffered a Concrete Injury to Its Activities.*

Defendants describe "the existence of a 'direct conflict' between the [defendants'] alleged conduct and the Plaintiff organization's mission is clear," given plaintiff's "mission . . . to improve and enhance travel for consumers," and considering plaintiff's allegations that defendants' practices "generate significant burden for individual consumers," Defs.' Opp'n at 16 (quoting Compl. ¶¶ 13, 42). If defendants' cherry-picked aspect of plaintiff's mission was the sole raison d'être for the latter's existence and operations, defendants might be on firmer terrain. *See, e.g.*, *PETA*, 797 F.3d at 1089, 1095 (USDA's allegedly unlawful failure to "craft avian-specific animal welfare regulations" or apply "general animal welfare regulations to birds" "does hamper and directly conflicts with PETA's stated mission of preventing 'cruelty and inhumane treatment of animals' through . . . 'public education' and 'cruelty investigations'" (citation and emphasis omitted)). Yet, plaintiff defines its mission as far broader and merely *encompassing* "initiatives to oppose hidden hotel fees" like those allegedly employed by defendants here. Compl. ¶¶ 13, 106; *see also* Mot. Hr'g Tr. at 19:24–20:2. As defendants allege in their Notice of Removal, plaintiff's mission includes the "education of travelers and regulators," which parts of its mission are carried out by "gather[ing] facts, analyz[ing] issues, and disseminat[ing] that information to

the public, the travel industry, regulators and policy makers," and through "newsletters" and a "[s]eries of instructional videos for consumer protections."  Defs.' Not. Removal ¶ 31 (citing *id.*, Decl. of Bridget K. O'Connor, Defs.' Counsel ("O'Connor Decl."), Ex. B-2, Travelers United 2019 Tax Return, ECF No. 1-12).  Plaintiff also "meets with travel industry leaders . . . to educate and advocate on issues regarding privacy, disclosure of fees, consumer safety, complaint resolution and best customer service practices for travelers."  *Id.*, O'Connor Decl., Ex. B-3, Travelers United Webpage, "Your Membership Includes," ECF No. 1-13; *see also* Mot. Hr'g Tr. at 21:14–19 (plaintiff's counsel stating plaintiff's "mission is to provide information to our customers, to counsel them when they call us and ask for help with Travelers issues, [and] advocate for them with respect to various corporations when they're having trouble with the airlines or with the hotels or with the car rental associations").

Plaintiff's mission of "improv[ing] and enhanc[ing] travel for consumers," has led to plaintiff's focus on junk fees broadly used by companies in the "U.S. hotel industry," not just defendants, and plaintiff's activities in meeting with elected officials and others to "educat[e], alert[], and advocat[e] against hidden hotel Junk Fees" generally.  Compl. ¶¶ 13–14; *id.* ¶ 22 (alleging that "in 2017 alone, the Junk Fee revenue of the U.S hotel industry was approximately $2.7 billion").  In other words, plaintiff's mission includes "advocating against hidden hotel fees," Compl. ¶ 13, and this mission would thus appear to be furthered by uncovering what it views as defendants' "junk fee practices," *id.* ¶ 30 (capitalization omitted).  As plaintiff has made clear, "[e]ducating the public about Junk Fees is part and parcel of Travelers' mission and does not extend beyond what Travelers does in the normal course."  Pl.'s Reply at 11 (quotation marks, brackets, and citation omitted); *see* Mot. Hr'g Tr. at 19:17–22, 21:8–11 (Plaintiff's counsel replying to Court's query about "how is the charging of junk fees by defendant in direct conflict

with Travelers' mission[,]" that "junk fees and providing information about them is part of our mission" and "there is no impediment to our mission by the junk fees"); *see also Int'l Acad. Of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*, 195 F. Supp. 3d 243, 250–51, 261 (D.D.C. 2016) (finding no conflict between organization's "mission . . . to reduce the level of mercury in all drugs" and FDA's promulgation of rule classifying dental amalgam containing mercury as Class II device, where plaintiff "does not claim that prior to 2009 its mission was any broader than eliminating mercury in drugs," so "it is entirely speculative whether the challenged practice . . . will actually impair the organization's activities" (quotation marks and citations omitted)). Engagement allegedly by defendants and other hotels in junk fee practices has drawn plaintiff's attention, in a manner wholly consistent with, rather than harming, its mission, with the possible concomitant benefits to plaintiff of enhancing its value to its members and its public profile on this issue.  No conflict with plaintiff's mission is presented.

Even were a concrete conflict between plaintiff's mission and defendants' alleged "Junk Fee practices," Compl. ¶ 30, assumed, however, defendants "offer[] *no* evidence of any concrete harm that accrued to [plaintiff] as a result" of defendants' alleged conduct, *Clean Label Project Found. v. Garden of Life, LLC*, No. 20-cv-3229 (RC), 2021 WL 4318099, at *4 (D.D.C. Sept. 23, 2021) (emphasis in original).  As to this second-prong of the injury-in-fact inquiry, defendants argue that plaintiff has suffered a "concrete and demonstrable" injury from having "engaged in expenditures . . . to monitor and to counteract on an ongoing basis public impressions created by Hilton's alleged conduct," which expenditures have made plaintiff's "overall task of facilitating consumer travel more difficult."  Defs.' Opp'n at 16, 19 (citing Defs.' Not. Removal ¶ 32) (cleaned up).  As support, defendants cite their removal notice, *see id.*, which alleges that plaintiff's "education efforts include warning consumers and industry members about, and advocating

responses to, resort fees," that plaintiff's "staff regularly meets with travel industry leaders . . . to educate and advocate on issues regarding . . . disclosure of fees" and "frequently appear[s] in news articles to create awareness of the existence of these fees and to inform consumers how to avoid them," and that plaintiff's website contains "content warning consumers about these fees."  Defs.' Not. Removal ¶ 32.  Defendants also allege that plaintiff "has diverted at least some resources to create content educating consumers about hotel fees."  *Id.* ¶ 31 (citing plaintiff's 2019 tax return that lists "'education of travelers and regulators' as its 'mission'"; "explain[s] that its 'staff gathers facts, analyzes issues, and disseminates that information to the public, the travel industry, regulators and policy makers'"; and records plaintiff's "$94,488 in expenses for program services" (citations omitted)).

These allegations fall short.  While defendants allege that plaintiff engages in "education efforts," including with regard to junk fees, and "has diverted at least some resources to create content educating consumers about hotel fees," *id.* ¶ 31, this is insufficient to show that defendants' alleged junk fee practices have "perceptibly impaired" plaintiff's mission or "inhibit[ed] . . . [its] daily operations," *PETA*, 797 F.3d at 1094 (citations omitted), such as by "restrict[ing] the flow of information [plaintiff] uses to educate its members," *EPIC*, 892 F.3d at 1256 (citation omitted) (finding no organizational standing); *see also Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*, No. 14-cv-1915 (APM), 2016 WL 4435175, at *7 (D.D.C. Aug. 19, 2016) (same, where organization "nowhere alleges how . . . [defendant's] actions inhibit those operations," and in any event, plaintiff's "[c]omplaint fails to even attempt to demonstrate how this alleged impairment would, or has already, forced [plaintiff] to modify its basic programmatic services in any way" (emphasis and citation omitted)).  Nor, in contrast to cases cited by defendants, *see* Defs.' Opp'n at 16–22, do the allegations establish that plaintiff's spending on

junk fee-related educational efforts have "subject[ed] [plaintiff] to operational costs beyond those normally expended," *Vilsack*, 808 F.3d at 920 (quotation marks and citations omitted), such as by requiring plaintiff to "broaden the scope of [its] efforts in order to reach all forms of" unlawful travel practices, *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 28 (D.C. Cir. 1990) (citations omitted).[11]

Rather, defendants' Notice allegations—that plaintiff engages in "consumer education efforts" related to junk fees and "has diverted at least some resources" due to defendants' alleged

---

[11]     Defendants rely on cases where an adequate showing was made of an injury-in-fact to the plaintiff organization challenging conduct that was contrary to the organizational mission, but these cases are unhelpful here where plaintiff's mission encompasses and is consistent with raising awareness of and mitigating the challenged conduct. *See* Defs.' Opp'n at 16–19 (citing (1) *Havens Realty Corp.*, 455 U.S. at 378–79 (finding organizational standing where alleged discriminatory housing "practices [] perceptibly impaired [plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers," requiring it to "devote significant resources to identify and counteract the defendant's . . . racially discriminatory steering practices" (citations omitted)); (2) *Abigail All.*, 469 F.3d at 132–33 (finding standing where plaintiff organization alleged defendants' conduct frustrated organizational "efforts to assist its members and the public in accessing potentially life-saving drugs and its other activities . . . [and] caused a drain on [plaintiff's] resources and time" (citation omitted)); (3) *Fair Emp. Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1270, 1276 (D.C. Cir. 1994) (finding that organization with "a broad goal of promoting equal opportunity" had standing at dismissal stage to maintain suit alleging "a pattern, practice and policy of employment discrimination on the basis of race," where defendant's "alleged pattern of discrimination . . . might increase the number of people in need of counseling," and "may have reduced the effectiveness of any given level of outreach efforts" (citations omitted)); (4) *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27, 31 (D.C. Cir. 1990) (holding fair housing organizations that alleged "defendants' preferential advertising tended to steer black home buyers and renters away from the advertised complexes" had standing, where defendants' conduct "impelled the organizations to devote resources to checking or neutralizing the ads' adverse impact"); (5) *O.A. v. Trump*, 404 F. Supp. 3d 109, 142–43 (D.D.C. 2019) (finding standing for organizations providing legal services to asylum seekers to challenge rule barring the granting of asylum to certain aliens, where as a result of challenged rule, organizations "will be unable to represent the same number of clients that it does currently, will need to spend more resources on each individual case, and will be force[d] . . . to divert scarce resources away from other important programs" (alteration in original) (quotation marks and citations omitted)); (6) *Organic Consumers Ass'n v. Hain Celestial Grp., Inc.*, 285 F. Supp. 3d 100, 101–03 (D.D.C. 2018) (finding standing for nonprofit group that "exists to promote the interests of organic consumers" and "funds programs aimed at informing organic consumers about the dangers of synthetic and genetically-modified ingredients," to challenge defendant food company's allegedly improper labeling of challenged products containing "synthetic ingredients" as "organic," which generated a "need to counteract the Defendant's assertedly illegal practices . . . and requir[ed] still more programmatic efforts" (quotation marks, brackets, and citations omitted)); and (7) *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 983 F. Supp. 2d 170, 172, 176, 178 (D.D.C. 2013) (finding standing for organization "dedicated to preserving the country's visual beauty" to challenge Guidance document allowing construction of digital billboards along interstate highways, where Guidance will "force the organization to combat an increased number of digital billboards with a concomitant drain on the resources dedicated to other conservation programs")). Finally, another case cited by defendants is fully consistent with plaintiff's position, *see* Defs.' Opp'n at 17 (citing *Equal Rts. Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)), since in that case, that court affirmed the *lack* of organizational standing, *see Equal Rts. Ctr.*, 633 F.3d at 1138 (affirming district court's grant of summary judgment to defendant, noting "[a]n organization's expenditure of resources on a lawsuit does not constitute an injury in fact sufficient to establish standing'").

junk fee practices, Defs.' Not. Removal ¶ 31, are even weaker than those found deficient in *Viasat, Inc.*, 47 F.4th 769.  In that case, the D.C. Circuit found the organization's "barebones statements" in its affidavit that the challenged agency's licensing-related decision "forced [the organization] to redeploy personnel and divert other resources," and that the organization had "spent at least $10,000," were "too conclusory to establish organizational standing." *Id.* at 781 (quotation marks and citations omitted); *see also Vilsack*, 808 F.3d at 920 (holding consumer advocacy group failed, at the pleading stage, to allege injury in fact sufficient to support organizational standing, where group did not allege challenged action "restricts the flow of information that [plaintiff] uses to educate its members," and although plaintiff's declarant "alleges that [plaintiff] will spend resources educating its members and the public . . . nothing in [the] declaration indicates that [plaintiff's] organizational activities have been perceptibly impaired in any way" (citations omitted)).[12]

Simply put, the allegations in both the complaint and Notice of Removal, accepted as true, show not even "an abstract injury to [plaintiff's] interests," *Vilsack*, 808 F.3d at 920, falling far short of what is required for organizational standing.

### E.    Defendants' Request for Jurisdictional Discovery Is Denied.

To compensate for the shortcomings in the jurisdictional allegations to support standing, defendants seek, in the alternative, an order that would "deny [plaintiff's] motion without prejudice and allow Hilton to obtain jurisdictional discovery," Defs.' Opp'n at 22, with all of the concomitant

---

[12]    Defendants argue that insofar as plaintiff objects that "its activities amount to nothing more than 'pure issue advocacy,'" which defendants concede is "not a cognizable basis for standing," this principle is limited to suits brought against the government "to alter government regulatory policy," which has no application here.  Defs.' Opp'n at 20–21 (citations omitted).  This argument is beside the point, since even taking into account plaintiff's efforts to "inform[] and counsel[] consumers directly" in addition to "public lobbying and advocacy that is insufficient to create standing," *id.* at 21, as discussed *supra*, defendants have simply failed to establish that their alleged junk fee practices "perceptibly impaired" plaintiff's mission or "inhibit[ed] . . . [its] daily operations" sufficient to support organizational standing, *PETA*, 797 F.3d at 1094–95 (citations omitted).

delay in resolving the appropriate forum for this CPPA lawsuit such discovery would entail.  Of course, a party seeking jurisdictional discovery "need only have a good faith belief that reasonable discovery could supplement . . . jurisdictional allegations[,]" *Lewis v. Mutond*, 62 F.4th 587, 596 (D.C. Cir. 2023) (quotation marks and citations omitted), and, generally, where such requested discovery may be the linchpin to allow the case to move forward in a plaintiff's chosen forum, courts are instructed to provide some leniency in granting the request so long as the movant "demonstrates that it can supplement its jurisdictional allegations through discovery," *id.* (quoting *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48–49 (D.C. Cir. 2020) (concluding "limited jurisdictional discovery" should be permitted given plaintiff's showing that "it can supplement its jurisdictional allegations through discovery" (citations omitted))); *see also Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1014, 1024 (D.C. Cir. 1998) (holding jurisdictional discovery permissible where "the record suggests at least one way in which the appellees *may* be able to establish their standing" (emphasis in original)).

At the same time, "[a] district court acts well within its discretion to deny discovery when no facts additional discovery could produce . . . would affect the jurisdictional analysis," *Mutond*, 62 F.4th at 595 (quotations marks and citation omitted), and the discovery request would simply be a "fishing expedition," *id*. at 596 (citation omitted).  Here, the jurisdictional allegations are so thin that defendants' discovery request raises a strong specter of a disapproved "fishing expedition" into plaintiff's operations and, in any event, would be futile.  *Id.* at 596 (quoting *Bastin v. Fed. Nat. Mortg. Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997)); *see also Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1089 (D.C. Cir. 1998) (affirming denial of jurisdictional discovery where plaintiff "has alleged absolutely nothing . . . to indicate that a court in the District of Columbia might constitutionally assert [personal] jurisdiction over [defendant]");

*McMullen v. Synchrony Bank*, 128 F. Supp. 3d 180, 185 (D.D.C. 2015) (denying additional jurisdictional discovery where "the Court has difficulty seeing how additional discovery could help [plaintiff] prove that the local controversy exception" to CAFA applies); *Kormendi/Gardner Partners v. Surplus Acquisition Venture, LLC*, 606 F. Supp. 2d 114, 120 (D.D.C. 2009) (remanding for lack of jurisdiction and "declin[ing] to order jurisdictional discovery" where defendant "has not set forth specific allegations demonstrating how jurisdictional discovery would serve a legitimate purpose" and "fails to explain how there is anything to be gained from" it (citations omitted)).

Defendants provide little explanation of how discovery would impact assessment of plaintiff's standing, on either an associational or organizational basis.  Despite assurances that "discovery would be 'precisely focused,'" defendants only broadly indicate discovery requests issued to plaintiff would "likely address Travelers's membership and structure" and "organizational operations and expenditures."  Defs.' Opp'n at 24 (quoting *Donkeyball Movie, LLC v. Does*, 810 F. Supp. 2d 20, 32 (D.D.C. 2011), and citing Defs.' Not. Removal ¶¶ 27–29, 31–32).  Only when queried by the Court at the motions hearing did defendants supplement this skeletal argument, stating they would seek certain categories of records, such as "membership rolls, including the location" of "members . . . relative to the classes proposed"; plaintiff's "membership types," including "whether or not [members are] dues-paying and whether they have any active roles or other classifications that Travelers tracks in its records"; "documents that reflect the roles that the members play within the organization including whether Travelers solicits members' active participation"; and "records as to Travelers' organizational expenditures for, among other things, its counseling efforts."  Mot. Hr'g Tr. at 71:23–72:10.  While true that "the party opposing the federal forum is often in sole possession of information that could establish (or

defeat) jurisdiction," Defs.' Opp'n at 23; *see also* Defs.' Not. Removal ¶ 27 (citations omitted), defendants do not persuade that *any* of this additional information would result in any change in the jurisdictional analysis or, most importantly, produce a different conclusion.

As to associational standing, while discovery regarding plaintiff's membership "rolls" and "types," Mot. Hr'g Tr. at 71:23–25, could help flesh out whether plaintiff bears "indicia of a traditional membership association," *Viasat, Inc.*, 47 F.4th at 781 (citation omitted), no amount of discovery would impact the third required element of associational standing, given plaintiff's request for money damages that would "require[] individual members to participate in the litigation," *Ctr. for Biological Diversity*, 56 F.4th at 66 (citation omitted); *see* Mot. Hr'g Tr. at 64:24–65:2 (defense counsel conceding that "the full picture as to what remedies that any particular absent class member may or may not be entitled to [] may be more complicated than simply looking at defendants' records").

As to organizational standing, "records as to Travelers' organizational expenditures for . . . its counseling efforts," Mot. Hr'g Tr. at 72:7–9, could inform whether plaintiff has had to increase its expenditures and reallocate resources to address defendants' alleged junk fee practices, but begs the question of whether any such increase amounts to either a "direct conflict between the defendant[s'] conduct and the organization's mission," *EPIC*, 892 F.3d at 1255 (citation and emphasis omitted), or an "injury," *PETA*, 797 F.3d at 1094 (citations omitted). On this separate question of whether plaintiff's efforts *vis a vis* defendants' alleged junk fee practices frustrate its mission or operation, defendants would have to overcome plaintiff's allegations that its mission expressly *encompasses* educational efforts regarding junk fees, and thus does not conflict with defendants' alleged "junk fee practices," Compl. ¶¶ 13, 30 (capitalization omitted). Even if defendants were to obtain information supporting a showing of resource diversion, that

information would have no bearing on the necessity of there being a "direct conflict between the defendant[s'] conduct and the organization's mission." *EPIC*, 892 F.3d at 1255 (citation and emphasis omitted).[13]

This conclusion is reinforced by the fact that, unlike the traditional removal context in which defendants are subject to a one-year window for removal, *see* 28 U.S.C. § 1446(c)(1), plaintiff's putative class action, under CAFA, "may be removed at any point during the pendency of litigation in state court," provided defendants remove "within thirty days after . . . [being] put on notice that a case which was not removable based on the face of the complaint has become removable," *Dudley v. Eli Lilly & Co.*, 778 F.3d 909, 913 (11th Cir. 2014) (emphasis omitted) (citing 28 U.S.C. § 1453(b) (providing § 1446(c)(1)'s one-year removal time limit "shall not apply" to actions removed pursuant to CAFA)); *see also Kenny v. Wal-Mart Stores, Inc.*, 881 F.3d 786, 791 (9th Cir. 2018) ("[A] CAFA case may be removed at any time, provided that neither of the two thirty-day periods under [28 U.S.C.] § 1446(b)(1) and (b)(3) has been triggered." (second alteration in original) (citation omitted)); *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 820 (5th Cir. 2007) (CAFA "compensates for the [Court's] inability to conduct an in-depth fact finding mission by permitting defendants to remove the case to federal court at any point in the litigation." (citation omitted)).

Consequently, this Court's order directing remand may "not permanently foreclose [defendants] from attempting to remove this case to federal court," *Amoche v. Guarantee Tr. Life Ins. Co.*, 556 F.3d 41, 53 (1st Cir. 2009), nor does it prejudice the parties "in their opportunity to develop the record with regard to" Article III standing "by return[ing] to state court," *Abrego*

---

[13]     Defendants cite several cases in which jurisdictional discovery was deemed appropriate, *see* Defs.' Opp'n at 22–24 (citing cases), but all are inapposite since in each cited case—unlike here—the movant demonstrated "a good faith belief that reasonable discovery could supplement . . . jurisdictional allegations[,]" *Mutond*, 62 F.4th at 596 (quotation marks and citations omitted).

*Abrego v. Dow Chem. Co.* ("*Abrego*"), 443 F.3d 676, 691 (9th Cir. 2006).   Rather, despite defendants' failure in this "early stage[] of litigation" to satisfy their burden of removal, defendants "may still have recourse to the federal courts later, after a fuller record has been developed in discovery in the state court." *Dudley*, 778 F.3d at 913 (citations omitted); *see also Abrego*, 443 F.3d at 691–92 (affirming remand of mass action removed pursuant to CAFA and concluding district court acted "well within [its] discretion to remand to state court rather than ordering jurisdictional discovery, with the knowledge that later-discovered facts may prompt a second attempt at removal"); *Sloan v. Soul Circus, Inc.*, No. 15-cv-1389 (RC), 2015 WL 9272838, at *5 n.5, 14 (D.D.C. Dec. 18, 2015) (remanding CPPA matter and finding that plaintiff, who invoked CAFA jurisdiction, "suffers little from [] decision" to decline to order additional briefing, since "if while in D.C. Superior Court more evidence about potential damages comes to light and shows an amount in controversy sufficient to give this Court jurisdiction, [plaintiff] may remove once again to federal court" (citing *Dudley*, 778 F.3d at 917)).

  This prospect of recurrent removal may invite "gamesmanship," for example, by a defendant who "wait[s] until the state court has shown itself ill-disposed to [it], or until the eve of trial in state court, before filing a notice of removal," *Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1126 (9th Cir. 2013), and beget a merry-go-round of successive removals to this Court based on developments arising subsequent to an original remand.   Despite the concomitant delays in reaching the merits of plaintiff's claims at each removed or remanded step, CAFA so authorizes and "jurisdictional facts are evaluated as they stand at the time of removal."   *Dudley*, 778 F.3d at 913 (citation omitted); *see also Abigail All.*, 469 F.3d at 132 ("At each stage of trial, the party invoking the court's jurisdiction must establish the predicates for standing[.]" (citation omitted)).   On this record, defendants have not "establishe[d] that it is more likely than not that jurisdiction

lies." *Abrego*, 443 F.3d at 691.  This necessitates remand, the prospect of gamesmanship or successive removals notwithstanding.

*      *      *

Defendants have fallen short of demonstrating that plaintiff has either associational or organizational standing for the exercise of subject matter jurisdiction in federal court, or that supplementation through discovery of the jurisdictional allegations set out in defendants' Notice of Removal would help.  *See Mutond*, 62 F.4th at 595.  Remand is therefore required.[14]

---

[14]     Plaintiff's request for attorneys' fees and costs, *see* Pl.'s Mot. at 17–18; Pl.'s Reply at 14–15, is denied.  Although attorney's fees and "just costs" may be awarded upon issuance of an order remanding a case, 28 U.S.C. § 1447(c), such fees generally are allowed "only where the removing party lacked an objectively reasonable basis for seeking removal," *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005), which has been construed to mean when the basis for removal is directly at odds with "clear, controlling case law from the D.C. Circuit," *Earth Island Inst. v. BlueTriton Brands*, 583 F. Supp. 3d 105, 112 (D.D.C. 2022) (quoting *Toxin Free USA*, 507 F. Supp. 3d at 47, and citing *Breathe DC v. Santa Fe Nat. Tobacco Co.*, 232 F. Supp. 3d 163, 172 (D.D.C. 2017)).  Here, defendants' asserted basis for removal of a putative class action lawsuit that meets the statutory CAFA requirements "has at least some logical and precedential force behind it," and "we cannot say that defendants 'lacked an objectively reasonable basis for seeking removal.'" *Knop v. Mackall*, 645 F.3d 381, 383–84 (D.C. Cir. 2011) (quoting *Martin*, 546 U.S. at 141) (citing these reasons for reversing district court's award of attorney's fees for remanded case). Plaintiff's contention that fees and costs should nevertheless be awarded even if this Court were to "deem[] Hilton's attempt at removal reasonable or a close call . . . in order to deter companies from exploiting removal," Pl.'s Mot. at 18, may have more force on successive attempts to remove a CPPA putative class action lawsuit, but not at this stage of this litigation.

43

## IV.  CONCLUSION

For the foregoing reasons, plaintiff's Motion to Remand is GRANTED.   An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: June 7, 2024

_____
**BERYL A. HOWELL**
United States District Judge